**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

PAMELA R. REED,

         Plaintiff,

vs.

CEDAR COUNTY and CEDAR
COUNTY SHERIFF DANIEL
HANNES,

         Defendants.

No. 05-CV-64-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.      *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.     *RELEVANT PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . **3**

III.    *JURISDICTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

IV.    *FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
       A.     *Cedar County Hired Reed as its Jail Administrator* . . . . . . . . . . . . **5**
       B.     *Cedar County's Written Anti-Harassment Policies* . . . . . . . . . . . . **6**
       C.     *Training on the Second Policy* . . . . . . . . . . . . . . . . . . . . . . . . . **7**
       D.     *Reed's Personal Life* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
       E.     *The Harassment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
       F.     *Reed's Reaction to the Harassment* . . . . . . . . . . . . . . . . . . . . . **13**
       G.     *Defendants' Reaction to Reed's Complaints* . . . . . . . . . . . . . . . **14**
       H.     *Reed's Salary History & Work Performance* . . . . . . . . . . . . . . . **16**
       I.     *The Desk Search* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
       J.     *The Stipulation for Paid Administrative Leave* . . . . . . . . . . . . . . **17**

V.      *STANDARD FOR SUMMARY JUDGMENT* . . . . . . . . . . . . . . . . . . . . **18**

VI.    *REED'S SEXUAL HARASSMENT CLAIMS (COUNT I)* . . . . . . . . . . . **20**
       A.     *Hostile Work Environment Claims* . . . . . . . . . . . . . . . . . . . . . . **21**
             1.     *"Tangible Employment Action"* . . . . . . . . . . . . . . . . . . **22**

|  |  | a. | *Reed's paid administrative leave* | . . . . . . . . . . . . . | 22 |
|  |  | b. | *Reed's failure to receive raises* | . . . . . . . . . . . . . . | 23 |
|  |  | 2. | *The* Ellerth/Faragher *Affirmative Defense* | . . . . . . . . . . . | 24 |
|  |  | a. | *Prevention by Cedar County* | . . . . . . . . . . . . . . . . | 24 |
|  |  | b. | *Corrective action by Cedar County* | . . . . . . . . . . . | 25 |
|  |  | c. | *Conclusion* | . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
|  | B. | | *Constructive Discharge Claims* | . . . . . . . . . . . . . . . . . . . . . . . | 28 |

VII. **REED'S RETALIATION CLAIMS (COUNT II)** . . . . . . . . . . . . . . . . . 29
   A.   *Employment-Related Retaliation Claims*  . . . . . . . . . . . . . . . . . . 31
      1.   *The Prima Facie Case*  . . . . . . . . . . . . . . . . . . . . . . . . 31
         a.   *Protected conduct* . . . . . . . . . . . . . . . . . . . . . . . . 31
         b.   *Adverse employment action*  . . . . . . . . . . . . . . . . . . 32
         c.   *Causal nexus between protected conduct and adverse
               employment action* . . . . . . . . . . . . . . . . . . . . . . . 34
         d.   *Conclusion*  . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
      2.   *The Legitimate, Nondiscriminatory Reasons* . . . . . . . . . . . 37
   B.   *Retaliatory Litigation Claims* . . . . . . . . . . . . . . . . . . . . . . . . 38
   C.   *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

VIII. **THE INDIVIDUAL CAPACITY CLAIMS** . . . . . . . . . . . . . . . . . . . . 39
   A.   *Reed's Title VII Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   B.   *Statute of Limitations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
   C.   *Punitive Damages*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

IX. **CONCLUSION**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## I. INTRODUCTION

The matters before the court are the "Motion for Summary Judgment (By Cedar County, Iowa and Sheriff Daniel Hannes (in his Official Capacity))" ("Joint Motion") (docket no. 53) and the "Motion for Summary Judgment of Defendant Daniel Hannes" ("Sheriff Hannes's Motion") (docket no. 55).

2

## II. RELEVANT PROCEDURAL HISTORY

On July 27, 2004, Plaintiff Pamela R. Reed filed a complaint ("Administrative Complaint") with the Iowa Civil Rights Commission ("ICRC") and cross-filed it with the Equal Employment Opportunity Commission ("EEOC"). This Administrative Complaint alleges sexual harassment and retaliation, including complaints of a hostile work environment. Reed exhausted her administrative remedies on the Administrative Complaint.

On April 5, 2005, Reed filed a three-count Complaint in this court against Defendants Cedar County, Iowa ("Cedar County"), and Cedar County Sheriff Daniel Hannes ("Sheriff Hannes"), in his individual capacity and official capacity. Reed alleges that, between June 28, 2000, and November of 2004, while she was working as the Cedar County Jail Administrator, Sheriff Hannes sexually harassed her.

In Count I, Reed states that during her employment, "she was subjected to sex discrimination and sex harassment." Count I involves two different claims—a claim of hostile work environment sexual harassment and a claim of hostile work environment sexual harassment resulting in a constructive discharge. It involves alleged violations of two different statutes—Title VII, 42 U.S.C. § 2000(e), *et seq.* ("Title VII"), and the Iowa Civil Rights Act, Iowa Code ch. 216 ("ICRA"). Count I includes allegations against Cedar County; Sheriff Hannes, in his individual capacity; and Sheriff Hannes, in his official capacity.

In Count II, Reed claims retaliation, in violation of Title VII and the ICRA, against Cedar County and Sheriff Hannes, in his individual capacity and official capacity.

In Count III, Reed claims battery, in violation of Iowa common law, against Sheriff Hannes, in his individual capacity. Count III is based upon an incident which allegedly occurred on April 21, 2003.

3

On April 19, 2005, Cedar County and Sheriff Hannes, in his official capacity, jointly filed an Answer and Counterclaim. The counterclaim was a declaratory judgment action in which Defendants essentially asked for permission to discharge Reed. On April 21, 2005, Sheriff Hannes, in his individual capacity, filed a separate Answer.

On April 27, 2005, Reed filed a Motion to Dismiss Counterclaim. On May 6, 2005, Defendants filed a Resistance to the Motion to Dismiss Counterclaim. On November 7, 2005, the court found that it did not have jurisdiction over the counterclaim, because it was not ripe. Consequently, the court granted Reed's Motion to Dismiss Counterclaim and dismissed Defendants' counterclaim without prejudice. *See* Order (docket no. 24).

On December 7, 2005, Sheriff Hannes, in his official capacity, filed a similar claim for declaratory judgment in the Iowa District Court in and for Cedar County. *See Daniel Hannes v. Pamela R. Reed*, No. EQCV033533 (Iowa Dist. Ct. 2005). On December 23, 2005, Reed filed a motion to dismiss. On March 21, 2006, the state court granted Reed's motion to dismiss. On April 4, 2006, Sheriff Hannes appealed. The state case is currently pending before the Iowa Supreme Court. *See Daniel Hannes v. Pamela R. Reed*, No. 06-0605 (Iowa 2006).

On June 23, 2006, Reed filed a second complaint ("Second Administrative Complaint") with the ICRC and cross-filed it with the EEOC. In the Second Administrative Complaint, Reed alleges discrimination based on "sex" and "retaliation," and, specifically, she alleges retaliatory litigation based upon Sheriff Hannes's counterclaim and state court action. On September 7, 2006, Reed received an administrative closure letter from the ICRC. The letter provides, in part:

> These issues and arguments are already before the courts. It would seem that the determination as to whether the counterclaims are appropriate or retaliatory should be decided in that forum. There would seem to be no useful purpose in this agency investigating issues already before the court.

4

On August 31, 2006, Defendants filed the instant Joint Motion and requested oral argument.[1] On the same date, Sheriff Hannes filed Sheriff Hannes's Motion and requested oral argument. On October 31, 2006, Reed filed Plaintiff's Brief Resisting Motions for Summary Judgment ("Resistance"). On November 1, 2006, Defendants filed a Reply.

On February 1, 2007, the court held oral argument on the Joint Motion and Sheriff Hannes's Motion. Attorney Dorothy A. O'Brien represented Reed. Attorney Carlton G. Salmons represented Cedar County. Attorney Salmons also represented Sheriff Hannes, in his official capacity, and Attorney John P. Roehrick represented Sheriff Hannes, in his individual capacity. Finding the Joint Motion and Sheriff Hannes's Motion to be fully submitted and ready for decision, the court turns to consider them.

### III. JURISDICTION

The court has federal question subject matter jurisdiction over Reed's Title VII claims pursuant to 28 U.S.C. § 1331. It has supplemental jurisdiction over Reed's ICRA and battery claims pursuant to 28 U.S.C. § 1367. The court finds it has jurisdiction to review each of Reed's claims.

### IV. FACTUAL BACKGROUND

Viewing the facts in the light most favorable to Reed, as the law requires, *see Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am.,* 450 F.3d 816, 820 (8th Cir. 2006), the court finds the following facts for purposes of these summary judgment motions only:

#### A. Cedar County Hired Reed as its Jail Administrator

In 2000, Cedar County was in the process of building a new jail and hiring a jail administrator. Reed applied for the jail administrator position. Reed had previously been

---

[1] Defendants violated the Local Rules by presenting the court with an appendix which is comprised of 696 loose pages. *See* LR 56.1.e.2 ("The copy of the appendix delivered to the Clerk of Court will be used by the presiding judge, and must be reproduced on one side of the page, *bound or fastened at the left margin, and tabbed* to facilitate ready reference." (emphasis added)).

5

employed as a jailer in Dickinson County, Iowa, and had obtained a certification as a jailer at the Iowa Law Enforcement Academy ("ILEA") Jailer School.

On June 28, 2000, Reed began working for Cedar County as a jailer under the supervision of Sheriff Hannes. In mid-July of 2000, Sheriff Hannes, Cedar County Chief Deputy Sheriff Lyle Fitch ("Chief Deputy Fitch") and Cedar County Road Deputy Sheriff Dale Edens interviewed Reed for the jail administrator position. Cedar County then promoted Reed from jailer to the jail administrator. On July 30, 2000, Reed began working in the jail administrator position.

## B. Cedar County's Written Anti-Harassment Policies

When Reed started her employment with Cedar County on June 28, 2000, she was given an Employee's Handbook, which contained Cedar County's anti-sexual harassment policy ("First Policy"). The First Policy informed employees who believed harassment was occurring to bring the alleged harassment to the attention of his or her department head, the Cedar County Attorney ("County Attorney") or the Cedar County Board of Supervisors ("Board of Supervisors").

On December 18, 2000, Cedar County published and disseminated a new sexual harassment policy ("Second Policy"). The Second Policy provides, in part:

> 1. Any employee who has a complaint of sexual harassment at work by anyone, including Supervisors, co-workers, or visitors should immediately bring the problem to the attention of the Chairperson of the Board of Supervisors, Department Head or the County Attorney.
>
> 2. The County Attorney will investigate inquiries and/or complaints immediately or a person designated by the Board of Supervisors. All complaints will be handled in a timely and confidential manner. . . .
>
> 3. Investigation of a complaint will normally include conferring with the parties involved and any names or apparent

6

witnesses.  Employees shall be guaranteed an impartial and
fair hearing. . . .

Reed received a copy of the Second Policy in December of 2000, she read it and understood everything contained in the Second Policy.  Specifically, she knew that if she believed harassment was occurring, she could complain to her department head, the County Attorney or a member of the Board of Supervisors.

### C.  Training on the Second Policy

As jail administrator, Reed was in charge of training the jailers who worked under her supervision.  On May 14, 2001, Reed held a staff meeting in which she instructed the jail staff on the prohibition against sexual harassment.  Reed warned the jail staff against making jokes because others might find them offensive.  She instructed the jail staff that, if they became offended by a co-worker's statement or action, they should first confront the offender.  Reed instructed them that, if they were not comfortable confronting the offender, they should report the incident to her.  If she were the offender, they should report to Chief Deputy Fitch.

On January 3, 2002, Reed held another staff meeting in which the agenda included a discussion of the prohibition against sexual harassment.  At that meeting, Reed informed the staff that they could report incidents of sexual harassment to her or the assistant jail administrator, Melissa Streeter.   Reed also explained the steps involved in taking corrective action.   Reed's training left the jailers with the impression that sexual harassment would not be tolerated and that the complainant could complain about sexual harassment incidents to their supervisor, Chief Deputy Fitch, Sheriff Hannes, the chairperson of the Board of Supervisors or the County Attorney.

In late October of 2003, Cedar County held a mandatory sexual harassment training seminar for all of its employees.  Reed attended the training seminar and received the training handout, which explained the Second Policy.

7

### D. Reed's Personal Life

In the Fall of 2000, Reed began dating Rod Kampman. Kampman was a consultant to Cedar County during the time that the new jail was under construction. Reed and Kampman were engaged to be married in December of 2000. The two separated about the time the new jail opened in April or May of 2001.

In May or June of 2001, Reed began dating Tom Reed. Reed had hired Tom Reed as a jailer in March of 2001. Tom Reed received a copy of the Second Policy when he started working at the jail in March of 2001, and he understood the importance of keeping a harassment-free workplace and how to submit a complaint. In August of 2001, Reed and Tom Reed began living together. Reed and Tom Reed were married on December 6, 2001.

### E. The Harassment

Sheriff Hannes's conduct in the workplace and on business trips, included the following:

1. Shortly after Reed's interview for jail administrator in July of 2000, Sheriff Hannes began telling Reed how "fine" she looked in the dress she wore to the interview. Sheriff Hannes continued to make such remarks until about 2004, including making detailed comments about Reed's legs.

2. Reed and Sheriff Hannes both planned to attend the ILEA's annual Jail School in February of 2001 in Des Moines, Iowa ("February 2001 Jail School"). While he was making reservations to attend the February 2001 Jail School, Sheriff Hannes made a comment to Reed about getting adjoining motel rooms.

3. Throughout her employment, Sheriff Hannes frequently looked at Reed and raised his eyebrows up and down in a sexually suggestive manner.

4. Before the new jail opened on April 13, 2001, Reed went to Sheriff Hannes's office in the old jail. He frequently shut and locked the office doors when Reed entered.

8

5. Between 2001 and 2004, when Reed bent over in Sheriff Hannes's presence, he would frequently make comments such as, "bend over again," "ooh, baby," "how bad do you want your raise" and "want some candy, little girl?" He also told Reed how nice she looked "from back there." Sheriff Hannes made such a comment about once every three to four weeks throughout 2003.

6. At one point, either in the Winter of 2000 or March or April of 2001, when Reed was dating Rod Kampman, Sheriff Hannes told Reed that he had something for her and Kampman in his car. Sheriff Hannes directed Reed to open the package when she was at home. Reed retrieved a sack from Sheriff Hannes's car. She opened the sack at her home and it contained three XXX-rated videotapes.

7. Sheriff Hannes and Reed attended the three-day February 2001 Jail School. On February 6, 2001, they rode from Tipton, Iowa, to Des Moines, Iowa.[2] On the drive to Des Moines, Sheriff Hannes commented that Reed had nice legs and looked nice in the dress she wore to her job interview in July of 2000.

8. One evening during the February 2001 Jail School, Reed was preparing to exercise in the hotel's fitness facility when her telephone rang. Sheriff Hannes called and asked her to stop by his room. She went to Sheriff Hannes's motel room, his door was

---

[2] Tipton is approximately 143 miles east of Des Moines, and it takes about two and one-half hours to travel between the two cities in a car. These two facts are not in the record, but the court takes judicial notice of them solely for the purposes of any appellate review. *See* 29 Am. Jur. 2d *Evidence* § 78 (Supp. 2006) ("Courts often take judicial cognizance of the distances between two . . . locations and the . . . usual time required for travel between them." (Citations omitted.)); *see, e.g., Carroll v. United States*, 267 U.S. 132, 159-60 (1925) (taking judicial notice that Grand Rapids, Michigan, is about 152 miles from Detroit, Michigan); *The Apollon*, 22 U.S. 362, 374 (1824) ("[T]he Court is bound to take notice of public facts and geographical positions."); *Cervantes v. United States*, 263 F.2d 800, 803 n.5 (9th Cir. 1959) ("[W]e take judicial notice of the fact that San Clemente[, California,] is more than seventy miles from the nearest port of entry from Mexico.").

Case 1:05-cv-00064-LRR   Document 96   Filed 02/08/07   Page 9 of 44

partially open, she knocked and he invited her into the room. Reed found Sheriff Hannes completely naked and sitting in a chair masturbating. Reed was stunned and thought Sheriff Hannes was going to rape her. Sheriff Hannes told Reed to sit on the bed. Reed's legs were heavy and she cannot explain why she did not leave the room. She sat down on the foot of the bed. Hannes stood up, stood by Reed and finished masturbating. Reed does not know why, but she asked Sheriff Hannes for his permission to leave his motel room. He told her that she could leave. She returned to her room and became nauseated.

9.  When the February 2001 Jail School was complete, Sheriff Hannes and Reed rode back to Tipton together. On the return trip, Sheriff Hannes spoke graphically about threesomes with another couple, sexual escapades with others and his dreams about Reed.

10.  In about early March of 2001, Sheriff Hannes made a comment to Reed and Streeter about the fact that Reed met Sheriff Hannes in his hotel room during the February 2001 Jail School.

11.  In April of 2001, Sheriff Hannes walked by Reed's office and commented that she had a "nice ass."

12.  In July of 2001, Reed asked Sheriff Hannes why she had not received a pay raise. He responded with the question, "how bad do you want a raise?" and he moved his eyebrows up and down in a sexually suggestive way.

13.  On October 23, 2001, Reed asked Sheriff Hannes to put his weapon in the box and he replied, "depends on which box you want me to put it in." He also looked at Reed's buttocks and commented that he was looking at her "ass."

14.  In January of 2002, after Sheriff Hannes and Reed had conducted an interview of a potential employee, Sheriff Hannes asked Reed what color panties she was wearing.

15.  In January of 2002, Reed found a condom wrapped in a candy wrapper in her desk drawer. She took the condom to Sheriff Hannes, because she believed he had left it

there.  Sheriff Hannes admitted to having placed the condom in Reed's desk drawer, but he said that it was a joke.

16.  On February 8, 2002, Sheriff Hannes commented to Reed about how he liked the fact that she "filled out" her blouse.

17.  During 2001 and 2003, Reed jogged outside during her lunch breaks.  On multiple occasions, Sheriff Hannes drove his car and followed her as she jogged down the street.  He stuck his head out of the car window and "yelped" or "whooped out" at her.

18.  During 2001 and 2002, Sheriff Hannes touched his genitals and adjusted himself in Reed's presence.

19.  On several occasions in 2002 and 2003, Sheriff Hannes showed Reed a picture of a naked woman that he kept in his desk drawer.  He called the picture his "stress reliever."

20.  On one occasion in 2002 or 2003, Sheriff Hannes showed Reed a pornographic tape and asked Reed who had left the tape for him.

21.  Before Streeter quit in January of 2003, Sheriff Hannes often made comments to her about her breasts and her appearance.  In about March of 2001, Sheriff Hannes called Streeter "toots."  At one point, in Streeter's presence, Sheriff Hannes kneeled on a chair, spanked himself on the buttocks and invited Reed to spank him.

22.  On February 6, 2003, Sheriff Hannes commented to Reed that she "sure filled [her] blouse nicely."  The two went to dinner with Reed's adult daughter, and Sheriff Hannes told Reed's daughter that he liked to open car doors for "ladies" so he could see their "backsides."  Later, Sheriff Hannes told Reed that she was as pretty as her daughter and that her daughter was "really large busted."

23.  On February 7, 2003, Reed was in the office kitchen when Sheriff Hannes walked by, stuck his head into the kitchen, looked Reed up and down and told her that she had "a nice ass."

11

24. On February 11, 2003, Sheriff Hannes looked Reed up and down in a sexual way.

25. On February 12, 2003, Sheriff Hannes was leaving the jail. He told Reed that he would be "getting out his big weapon," and Reed understood it to be a reference to his genitals.

26. On February 14, 2003, Sheriff Hannes and Reed were together in the control room at the jail. When Sheriff Hannes raised his eyebrows up and down at Reed in a sexually suggestive manner, she said, "I quit."

27. In April of 2003, Sheriff Hannes told Reed she was "looking real fine," when they passed in a jail corridor.

28. At approximately 11:45 a.m. on April 21, 2003, Sheriff Hannes and Reed were preparing to give a jail tour. Just as they were walking into a classroom full of jail visitors, Sheriff Hannes slapped Reed on her buttocks.

29. On April 24, 2003, Reed was bending down and reaching into the bottom drawer of a file cabinet when Sheriff Hannes walked by her office and told her to "bend over again."

30. In early February of 2004, Sheriff Hannes, while raising his eyebrows up and down in a sexually suggestive manner, grabbed Reed's hand, squeezed it and asked if there was anything he could get her.

31. In early February of 2004, Sheriff Hannes told Reed that he was not going to order his own cup of coffee because he was going to "sip from her cup."

32. In early February of 2004, Reed told Sheriff Hannes that the weather report was for six to seven inches of snow, and he responded with the question, "Did you say you wanted six or seven inches from me?"

33. In early February of 2004, Sheriff Hannes followed Reed into a workout room and told her that she "looked good from back there."

12

34.  In early February of 2004, Sheriff Hannes told Reed to "bend over again."

35.  In early February of 2004, Sheriff Hannes told Reed details about his sex life and about the fact that his wife was not interested in him sexually.

### F.  Reed's Reaction to the Harassment

Between July of 2000 and February of 2001, while Reed worked as the jail administrator, Sheriff Hannes made no direct employment threats against her.  Sheriff Hannes did not threatened to demote or reassign Reed, none of Reed's job duties were taken from her and Reed suffered no loss of pay.  Sheriff Hannes's conduct did, however, make Reed cry, made her uncomfortable and resulted in loss of sleep.  Reed considered her employment threatened when Sheriff Hannes repeatedly reminded her that she was an "at-will" employee and when he asked her how badly she wanted her raises.

After Reed returned to work following the February 2001 Jail School, she started making notes on a notepad and in her personal calendar of Sheriff Hannes's comments and conduct that were offensive to her.  She kept the notes in the event Sheriff Hannes wanted to terminate her employment.  Reed also told Streeter about Sheriff Hannes's conduct during the February 2001 Jail School, but she never discussed the masturbation incident.  Reed advised Streeter that she had begun keeping notes and advised Streeter to keep similar notes, because Reed believed that Sheriff Hannes treated her and Streeter the same way.

Reed's notes did not include any information about the masturbation incident that occurred at the February 2001 Jail School.  Although Reed was dating Kampman at the time, she never told him about the masturbation incident which occurred during the February 2001 Jail School.

A number of times between August of 2001 and December 6, 2001, Reed complained to Tom Reed that Sheriff Hannes was making sexual comments to her and that she was bothered by the comments.  For example, Reed informed him that Sheriff Hannes

13

gave her XXX-rated videotapes to view. On a few occasions, Reed and Tom Reed discussed the Second Policy, reviewed it and agreed that Reed would deal with the harassment on her own without getting Tom Reed involved.

Reed complained about Sheriff Hannes's offensive behavior to Chief Deputy Fitch on several occasions. She complained to him at least twice before the end of 2002, and she complained on the following dates: January 24, 2003; March 4, 2003; May 1, 2003; and February 6, 2004. Each time, Reed told Chief Deputy Fitch about incidents where Sheriff Hannes offended her by his language or actions.

In late June or early July of 2004, Reed sought out legal advice from attorney Leanne Tyler. On July 12, 2004, Reed and Tom Reed met Tyler for the first time. Tyler advised Reed to tape record Sheriff Hannes to obtain evidence about the masturbation incident at the February 2001 Jail School. About one week prior to July 16, 2004, Reed decided that she would attempt to tape record Sheriff Hannes's statements. On Friday, July 16, 2004, Reed placed a digital tape recorder in her shirt pocket and attempted to tape record Sheriff Hannes while they stood and talked in a parking lot. She was unsuccessful. Reed then purchased another tape recorder. She wired it to her desk and, on Monday, July 19, 2004, she succeeded in secretly tape recording a conversation with Sheriff Hannes. On July 21, 2004, Reed delivered the tape to Tyler who then entered into a fee contract to represent Reed.

### G. Defendants' Reaction to Reed's Complaints

Despite Reed's complaints to Chief Deputy Fitch, he never began an investigation into the sexual harassment allegation. No one in Cedar County began an investigation. For the first time, on February 6, 2004, Chief Deputy Fitch spoke with Sheriff Hannes about Reed's complaints. Chief Deputy Fitch informed Sheriff Hannes that the comments and gestures were not welcome and told him to stop. Then, Reed confronted Sheriff Hannes, shouted at him and told him to stop conducting himself in the ways she found

14

offensive.  Sheriff Hannes apologized to both Chief Deputy Fitch and Reed, and he stopped making offensive comments and gestures.

Sometime after February 4, 2004, Reed held two meetings of the jail staff, which Sheriff Hannes attended as a passive observer.  Around the same time Reed's then-assistant jail administrator, Toni Duncan, complained to Sheriff Hannes about Reed's relationship with the jail staff.  When Duncan complained to Sheriff Hannes, Duncan also went to Reed's home to inform Reed that she (Duncan) had told Chief Deputy Fitch that she believed Reed was unprofessional and that about half of the jail staff wanted to quit. Sheriff Hannes investigated Duncan's complaints.  Sheriff Hannes contacted jail staffers at their homes and asked if they were having any problems in the workplace.  Chief Deputy Fitch went to Dickinson County, Iowa, to investigate, because Reed had previously worked at the Dickinson County Jail as a jailer.  Chief Deputy Fitch asked Dickinson County Sheriff Greg Baloun questions about what outfit Reed wore to her job interview and whether she acted inappropriately while employed as a jailer.  After Chief Deputy Fitch's trip to Dickinson County, Dickinson County jailer, Mary Childers, called Reed. After speaking with Childers, Reed was left with the impression that she was the subject of a criminal investigation.  Sheriff Hannes and Chief Deputy Fitch concluded their investigation into Duncan's complaints and found them to be without merit.

On September 14, 2004, Defendants' attorneys informed Reed that her "new, interim" supervisor would be Deputy Sheriff Johnson.[3]  Deputy Johnson is a young deputy who had no experience in jail administration.  Once Deputy Johnson began supervising Reed, she was no longer allowed to make even the simplest of decisions regarding inmate administration without first obtaining approval from Deputy Johnson. For example, Reed had to ask Deputy Johnson for permission to take an inmate to a physician.  Prior to September 14, 2004, Reed was authorized to make such decisions.

[3] The record is unclear whether Deputy Johnson's first name is "Jay" or "Jason."

15

### H. Reed's Salary History & Work Performance

When Cedar County hired Reed as the jail administrator, Sheriff Hannes told Reed that she would be paid on the deputy sheriff's pay scale, which meant her starting salary would be $31,490.00, which is equivalent to 70% of the sheriff's salary. Sheriff Hannes also told Reed that she would receive a raise to 75% of his salary, beginning on July 1, 2001.

When Reed started working as the jail administrator on July 28, 2000, Sheriff Hannes sought approval from the Board of Supervisors to pay Reed a salary which was equivalent to 70% of his own salary. The Board of Supervisors' meeting minutes from July 31, 2000, reflect that they approved her pay at the 70% level, or $31,490.00. Reed admits receiving that annual salary.

Sheriff Hannes failed to seek approval for the increase to the 75% salary level for Reed from the Board of Supervisors in January of 2001. However, the minutes from the Board of Supervisors' June 28, 2001 meeting reflect the fact that Sheriff Hannes requested Reed receive the 75% salary effective July 1, 2001. The Board of Supervisors rejected Sheriff Hannes's request and refused to give Reed a salary increase. On July 1, 2001, Reed only received a cost of living increase. After the 75% salary figure was rejected by the Board of Supervisors, Sheriff Hannes went to them and requested that Reed receive an additional $5,427.69, which represented Reed's 358 hours of accumulated "comp time." Sheriff Hannes convinced the Board of Supervisors that Reed's position was not exempt under the Fair Labor Standards Act and that she was entitled to the pay for comp time. She received the $5,427.69 in July of 2001. On December 7, 2001, which was in the middle of the fiscal year, Sheriff Hannes again sought a salary increase to 75% of his own salary for Reed. The Board of Supervisors' December 20, 2001 meeting minutes show that the proposed pay increase for Reed would be tabled until the Board of Supervisors would discuss the next fiscal year's budget. On May 15, 2002, Sheriff Hannes submitted

16

a notice of proposed pay for all of his employees to the Board of Supervisors. He proposed that Reed receive an increase to 75% of his own salary. The Board of Supervisors authorized the increase. On July 1, 2002, Reed began receiving a salary of 75% of Sheriff Hannes's salary. On July 1, 2003, she received a raise to a 77.5% of his salary. Then on July 1, 2004, she reached the ceiling of 80% of Sheriff Hannes's salary. Although she was on administrative leave after October 28, 2004, she received a salary increase on July 1, 2005. Effective July 1, 2005, and July 1, 2006, Reed received small salary increases due to the fact that Sheriff Hannes's salary increased slightly and she was receiving 80% of that amount.

Throughout Reed's employment with Cedar County, that is, between June 28, 2000, and October 28, 2004, Reed's job performance never suffered. Reed was a good jail administrator and ran the jail efficiently. Neither Sheriff Hannes nor Chief Deputy Fitch ever had any complaints about Reed's job performance. She was always professional.

### I. The Desk Search

At about 5:15 a.m. on October 21, 2004, Reed arrived at her office and discovered that someone had searched her office during the night shift, which spanned October 20 and 21, 2004. Reed did not report the search to the dispatcher or any other over-night staff members, but she did report it to her then-supervisor, Deputy Johnson. On October 22, 2004, Defendants changed the locks to Reed's office, gave Reed the only keys and put new door-locking procedures into place. However, Defendants' attorneys promised Reed's attorney that the Iowa Division of Criminal Investigation ("DCI") or some other law enforcement entity would conduct an investigation into the alleged search of Reed's office. Neither DCI nor any other law enforcement entity ever conducted such an investigation.

### J. The Stipulation for Paid Administrative Leave

On October 28, 2004, Reed and Cedar County, through their attorneys, entered into a stipulation in which they agreed that Reed would be placed on paid administrative leave

17

("Stipulation").  They stipulated that Reed would receive full pay and benefits with annual salary and cost-of-living increases.  Reed has been on this paid administrative leave since October 28, 2004.

In October of 2004, Cedar County hired Orville Randolph to fill the jail administrator position while Reed was on paid administrative leave.  Randolph is receiving 84% of Sheriff Hannes's salary, and his compensation package includes the use of a Cedar County vehicle for commuting.  Cedar County claims that it pays Randolph more than it paid Reed because Randolph is a deputy sheriff.

After the parties had reached the Stipulation and Reed had started to clean out her desk, Deputy Johnson told Reed:  "I'm supposed to tell you never to come back around here or in this building, and I guess there would be no reason for you to."

## V.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question."  *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  A fact is material when it is a fact that "might affect the outcome of the suit under the governing law."  *Id.*  The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences.  *Baer Gallery,* 450 F.3d at 820 (citing *Drake ex rel. Cotton v. Koss,* 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue."  *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  Once the moving party has

18

successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Baum v. Helget Gas Prods., Inc.,* 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.,* 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.,* 318 F.3d 803, 809 (8th Cir. 2003)).

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minn. Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir. 1991)). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson*, 931 F.2d at 1244. To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341.

Nevertheless, the Eighth Circuit Court of Appeals has also observed that, "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir. 1995) (citation and internal citation omitted); *accord Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134-35 (8th Cir. 1999) (observing that the burden-shifting framework of *McDonnell Douglas Corp.*

Case 1:05-cv-00064-LRR   Document 96   Filed 02/08/07   Page 19 of 44

*v. Green*, 411 U.S. 792 (1973), must be used to determine whether summary judgment is appropriate).

## VI.  REED'S SEXUAL HARASSMENT CLAIMS (COUNT I)

In Count I of the Complaint, Reed claims hostile work environment sexual harassment under Title VII and the ICRA.  Reed claims that the harassment was severe and pervasive, she reported the harassment, Defendants failed to investigate her complaints and she suffered a tangible employment action.  She claims she was constructively discharged due to the harassment.

Defendants move for summary judgment on Reed's sexual harassment claims. Defendants argue that Reed's sexual harassment claims fail entirely under *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), because Defendants took no "tangible employment action" against her. Defendants argue that Reed's claim fails because she unreasonably failed to take advantage of corrective opportunities provided by Cedar County to stop the sexually harassing behavior.

The Iowa Supreme Court has adopted the federal framework to analyze sexual harassment claims, so the court will apply the same analysis to Reed's Title VII and ICRA claims.  *See, e.g.*, *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 743-44 (Iowa 2003) (analyzing a hostile work environment claim based on racial harassment and noting that "the employer may assert the *Faragher-Ellerth* affirmative defense to avoid liability").[4]

_____

[4]  Iowa courts have traditionally turned to federal law for guidance in analyzing claims under the ICRA.  *King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983); *see also Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) (explaining that the ICRA was modeled after Title VII and that federal precedent is applicable to discrimination claims under the ICRA).  Although the Iowa Supreme Court has recently indicated it will entertain arguments that the ICRA can be interpreted differently than Title VII, neither

(continued…)

Case 1:05-cv-00064-LRR   Document 96   Filed 02/08/07   Page 20 of 44

### A. Hostile Work Environment Claims

Under Title VII and the ICRA, it is unlawful for an employer to discriminate against any person because of his or her sex. *See* 42 U.S.C. § 2000e-2(a)(1); Iowa Code § 216.6(1)(a). Sexual harassment in the form of a hostile work environment constitutes sex discrimination. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).

> To establish a prima facie case of sex discrimination based on a hostile work environment, a plaintiff employee must establish that (1) she was a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment was sufficiently severe or pervasive as to affect a term, condition, or privilege of employment.

*Cottrill v. MFA, Inc.*, 443 F.3d 629, 636 (8th Cir. 2006). "The fourth element involves both objective and subjective components." *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004) (citing *Duncun v. Gen. Motors Corp.*, 300 F.3d 928, 933 (8th Cir. 2002)). In other words, "the victim must subjectively believe that her working conditions have been altered[,]" and the environment must be objectively hostile or abusive. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).

Generally, an employer is vicariously liable for a hostile environment created by a supervisor. *See Faragher*, 524 U.S. at 780. However, when no "tangible employment action" has been taken against the employee, the employer may raise "an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Ellerth*, 524 U.S. at 765 (citing Fed. R. Civ. P. 8(c)).

---

[4](...continued)

party asks the court to deviate here. *See McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005) (declining to interpret ICRA differently than Title VII where neither party so argued, but indicating that, although Iowa courts have traditionally looked to federal law for guidance in interpreting the ICRA, they are not bound to federal law and may deviate from it if the parties argue for a deviation from the federal analysis).

Case 1:05-cv-00064-LRR    Document 96    Filed 02/08/07    Page 21 of 44

In the Joint Motion and Sheriff Hannes's Motion, Defendants do not discuss the four elements of Reed's hostile work environment claims. *See Cottrill*, 443 F.3d at 636. Rather, Defendants argue that they have an affirmative defense under *Ellerth* and *Faragher*. Therefore, the court operates under the assumption that Reed can establish a prima facie case of sexual harassment.

### 1. *"Tangible Employment Action"*

"An employer may assert the affirmative defense only '[w]hen no tangible employment action is taken.'" *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1195 (8th Cir. 2006) (quoting *Faragher*, 524 U.S. at 807-08); *see also Penn. State Police v. Suders*, 542 U.S. 129, 143 (2004) (explaining that *Ellerth* and *Faragher* divided hostile work environment claims into two categories: one where the employer is strictly liable because a tangible employment action is taken and one where the employer can make an affirmative defense).

Therefore, the court must first determine whether Defendants took a tangible employment action against Reed between the time she started working for Cedar County in June of 2000 until the time the harassment stopped, on February 6, 2004. "'[A] tangible employment action [is] 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits.'" *McCurdy v. Ark. State Police*, 375 F.3d 762, 769 (8th Cir. 2004) (quoting *Ellerth*, 524 U.S. at 761).

### a. *Reed's paid administrative leave*

Here, Reed has been employed by Cedar County as the jail administrator since July 28, 2000. On October 28, 2004, she was placed on paid administrative leave, pursuant to her Stipulation with Cedar County. Since October 28, 2004, Reed has continued to receive her full salary, raises and benefits from Cedar County. Importantly, the parties' Stipulation provides that Reed's placement on administrative leave cannot be considered a

22

constructive or retaliatory discharge or otherwise be used against either party during litigation. Moreover, Reed's paid administrative leave began over eight months after February 6, 2004, the date Sheriff Hannes stopped sexually harassing Reed and the hostile work environment ended. Therefore, the court concludes that Defendants did not take "tangible employment action" against Reed with regard to her placement on paid administrative leave.

### b. *Reed's failure to receive raises*

Reed argues that she suffered a significant change of benefits on July 1, 2001, because Sheriff Hannes failed to give her a pay raise. In response, Defendants argues alternatively that (1) Sheriff Hannes did not inflict economic harm on Reed and (2) Sheriff Hannes was incapable of inflicting economic harm on Reed because he was not her "supervisor" regarding "matters of [her] pay."

The court assumes, without deciding, that Sheriff Hannes had the power to effectuate a tangible employment action against Reed, that is, withhold a salary increase, because, as the court discusses next, the undisputed facts show that Sheriff Hannes did not inflict economic harm upon Reed. Sheriff Hannes sought a raise for Reed at the promised 75% level to be effective July 1, 2001, but during the June 28, 2001 meeting of the Board of Supervisors, they rejected his request. There is no disputed issue of fact that Sheriff Hannes attempted, without success, to award Reed the 5% raise. In fact, instead of waiting until the next fiscal year (the time when the Board of Directors typically examined all raise requests), Sheriff Hannes approached the Board of Directors with a request for a raise to the 75% level for Reed on December 20, 2001.

In sum, the court concludes that Sheriff Hannes never inflicted economic harm on Reed, and Defendants took no "tangible employment action" against her. Therefore, Defendants may assert the *Ellerth/Faragher* affirmative defense as to Reed's hostile work environment sexual harassment claims.

The court now turns to consider the merits of Defendants' affirmative defense.

## 2. The Ellerth/Faragher *Affirmative Defense*

"If no tangible employment action for which an employer may be held strictly liable has occurred, the employer is liable for sexual harassment by its employees only 'if it knew or should have known about the conduct and failed to stop it.'" *Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 881 (8th Cir. 2005) (quoting *Ellerth*, 524 U.S. at 759). "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Cottrill*, 443 F.3d at 633 n.2 (quoting *Ellerth*, 524 U.S. at 765, and *Faragher*, 524 U.S. at 807).[5] The court will address the two elements of the first prong of the defense, in turn.

### a. *Prevention by Cedar County*

There is no dispute that Reed received a copy of Cedar County's First Policy when she commenced her employment with Cedar County as a jailer in June of 2000. On December 18, 2000, Cedar County updated its anti-sexual harassment policy and disseminated copies of the Second Policy. Reed understood each policy and knew that she could complain about harassment by bypassing Sheriff Hannes and by reporting directly to either the Board of Supervisors or the County Attorney.

In October of 2003, Cedar County held a training course on the Second Policy. Cedar County required each county employee to attend. Reed attended the training course but did not learn anything new about the Second Policy. In this case, Reed was not only trained to use the Second Policy, but she was the trainer at times. Reed led staff meetings

---

[5] The Eighth Circuit Court of Appeals modified the *Ellerth/Faragher* defense in *McCurdy*. The modified defense is not applicable here, because this is not a case involving "a single incident of supervisor sexual harassment not resulting in tangible employment action." *Cottrill*, 443 F.3d at 633 n.2 (citing *McCurdy*, 375 F.3d at 769).

for the jail staff on May 14, 2001, and January 3, 2002. She introduced the Second Policy to the jail staff and advised them how to use it.

At all relevant times, Cedar County had a written anti-sexual harassment policy, which defined sexual harassment, set forth reporting procedures and stated that employees who violated the First Policy or the Second Policy would be disciplined and complaining employees would be protected. *Williams v. Mo. Dep't of Mental Health*, 407 F.3d 972, 976-77 (8th Cir. 2005) (finding a similar policy sufficient to support, in part, an affirmative defense). The Second Policy was disseminated to all Cedar County employees, and Cedar County provided mandatory sexual harassment training to all of its employees. *See id.* (explaining that first element of affirmative defense was satisfied where employer's policy was disseminated to new employees, the employees were trained on using the policy and the policy identified various employees to whom victims could report).

Cedar County's First Policy and Second Policy, along with its reporting procedure and county-wide employee mandatory training program, were sufficient to show that Cedar County exercised reasonable care to prevent sexual harassment under *Faragher*. There are no genuine issues of material fact regarding the reasonableness of Cedar County's anti-sexual harassment policies.

### b.    *Corrective action by Cedar County*

Reed has raised genuine issues of material fact as to whether Cedar County officials took prompt, corrective action once they learned about Sheriff Hannes's sexually harassing behavior. For this reason, the court shall hold that Cedar County cannot assert the affirmative defense and summary judgment shall not be granted on Reed's hostile work environment sexual harassment claims in Count I.

The Second Policy states, in part: "Any employee who has a complaint of sexual harassment at work by anyone . . . should immediately bring the problem to the attention of the Chairperson of the Board of Supervisors, Department Head *or* the County Attorney."

(emphasis added). Viewing the facts in the light most favorable to Reed, Chief Deputy Fitch was Reed's immediate supervisor and "department head." Reed complained about Sheriff Hannes's offensive behavior to Chief Deputy Fitch on several occasions. She complained to him at least six times between 2002 and 2004. Each time, Reed told Chief Deputy Fitch about incidents where Sheriff Hannes used offensive language or acted inappropriately. Despite Reed's complaints, Chief Deputy Fitch waited until February 6, 2004, to confront Sheriff Hannes, and Chief Deputy Fitch never began an investigation or informed the County Attorney about Reed's complaints. *Compare Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (reviewing district court's denial of a motion for a judgment as a matter of law and concluding that the employer could not succeed in asserting the affirmative defense because it did not exercise reasonable care to "correct promptly" the behavior, it minimized the victim's complaints, it "performed a cursory investigation which focused [on the victim's] performance, rather than [the offender's] conduct" and it forced the victim "to resign while imposing no discipline upon [the offender] for his behavior"), *with Jackson v. Ark. Dep't of Educ., Vocational & Technical Educ. Div.*, 272 F.3d 1020, 1026 (8th Cir. 2001) (determining that the employer satisfied the first prong of the affirmative defense because, "[u]pon notification of [the offender's] improper behavior, [the employer] immediately activated its anti-harassment prevention policy to investigate [the victim's] complaint and to avoid any situation in which [the offender] might repeat the behavior"). Therefore, a factfinder could conclude that Cedar County failed to exercise reasonable care to correct promptly the sexually harassing behavior.

Defendants argue that the first prong of the affirmative defense is satisfied when an employer "has disseminated an anti-harassment policy, which is known to the Complainant, and which allows her to bypass the ordinary chain-of-command in making complaints." Reply Brief at 8. They cite *Williams v. Missouri Department of Mental Health*, 407 F.3d

972, 976-77 (8th Cir. 2005), in support of their argument. In *Williams*, however, the employer both had an anti-harassment policy in place and immediately took action to correct the sexually harassing behavior upon learning about it. 407 F.3d at 975. In contrast, Chief Deputy Fitch failed to take action on at least five occasions when Reed complained about Sheriff Hannes's sexually harassing behavior.

Defendants make much of the fact that Reed made informal comments and complaints to Sheriff Hannes and Chief Deputy Fitch, rather than using the formal procedure set forth in the Second Policy. There is nothing in the law or Cedar County's First Policy or Second Policy which requires the complainant to lodge a formal or written complaint. Rather, the Second Policy provides, in relevant part, that an employee who has a complaint of sexual harassment "should immediately *bring the problem to the attention of* the Chairperson of the Board of Supervisors, Department Head or the County Attorney." (emphasis added). Indeed, the Second Policy does not require that the complaint be written, made during a meeting or appointment with the designated officials or otherwise made in a formal manner. As previously stated, Reed has presented facts showing that she brought "the problem to the attention of" her department head, Chief Deputy Fitch. Accordingly, her claims survive summary judgment.

### c. Conclusion

Although it is undisputed that Cedar County formulated effective anti-sexual harassment policies, disseminated the First Policy and Second Policy and trained its employees, Reed has presented material facts showing that Cedar County did not promptly take corrective action when it learned of Sheriff Hannes's sexually harassing behavior. Viewing the facts in the light most favorable to Reed, the court concludes that Cedar County did not promptly and effectively remedy the past sexual harassment or take any action to avoid future incidents of harassment. Therefore, Defendants cannot satisfy the first prong of the affirmative defense articulated in *Faragher*. Defendants' Joint Motion and

27

Sheriff Hannes's Motion shall be denied as to the hostile work environment claims in Count I.[6]

## B. Constructive Discharge Claims

"Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Suders*, 542 U.S. at 149. The Eighth Circuit Court of Appeals recently discussed constructive discharge claims. It said:

> "Constructive discharge occurs when an employer deliberately makes an employee's work environment so intolerable that resignation is the employee's only plausible alternative." *Williams v. City of Kansas City*, 223 F.3d 749, 753 (8th Cir. 2000) (applying Missouri law). "The conduct complained of must have been severe or pervasive enough to create an objectively hostile or abusive work environment, and additionally the plaintiff must subjectively perceive the environment to be abusive." *Johnson v. Runyon*, 137 F.3d 1081, 1083 (8th Cir. 1998) (internal quotations omitted). "The employer's actions must have been intended to force the employee to quit." *Tatom v. Ga.-Pac. Corp.*, 228 F.3d 926, 932 (8th Cir. 2000).

*EEOC v. City of Independence, Mo.*, 471 F.3d 891, 896 (8th Cir. 2006). An employee cannot show constructive discharge merely by showing that the employer violated Title VII. *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 706 (8th Cir. 2005). By definition, the employee must quit or resign: "'A constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation.'" *Id.* (quoting *Tatum v. City of Berkeley*, 408 F.3d 543, 551 (8th Cir. 2005)); *see also Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996) ("An

---

[6] Given the court's conclusion that Reed has defeated summary judgment by setting forth facts that would defeat Defendants' affirmative defense at trial by showing that Cedar County failed to investigate her complaints of sexual harassment, the court need not discuss the second prong of the affirmative defense.

employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged.").

Viewing the evidence in the light most favorable to Reed, it shows that her claim for constructive discharge fails, as a matter of law. On October 28, 2004, Reed signed the Stipulation and agreed to be placed on paid administrative leave. *Cf. City of Independence*, 471 F.3d at 893-94 & 896-97 (affirming grant of summary judgment on an ADEA and Missouri Human Rights Act constructive discharge claim where disabled employee chose to retire after his unpaid FMLA leave expired). Reed never resigned her position as jail administrator; she is still employed by Cedar County, albeit on paid administrative leave. Therefore, there has been no discharge, constructive or otherwise. *See Davis*, 421 F.3d at 706 (requiring a resignation).

Defendants' Motion and Sheriff Hannes's Motion shall be granted as to Reed's claims for constructive discharge. Reed's constructive discharge claims shall be dismissed.

## VII. REED'S RETALIATION CLAIMS (COUNT II)

In Count II, Reed claims retaliation under Title VII and the ICRA. Reed claims that Defendants retaliated against her after she complained about Sheriff Hannes's harassment in February of 2004 and after she filed the formal charge with the ICRC in July of 2004.

Defendants move for summary judgment on Reed's retaliation claims. Defendants argue that Reed's claims of employment-related retaliation fail because she has not suffered an "adverse employment action." Defendants further argue that her retaliatory litigation claims fail because the counterclaim and state court action were not pursued in bad faith.

In her resistance, Reed claims that Defendants carried out the retaliation in several ways, including the following: (1) Sheriff Hannes began attending her jail staff meetings, giving her the cold shoulder and generally undermining her authority; (2) Sheriff Hannes began investigating Reed and her department; (3) Sheriff Hannes, or someone under his command, searched her office; (4) Defendants removed her discretion and made her report

29

to an inexperienced supervisor;[7] and (5) Defendants filed a counterclaim and then a state court action against her.[8]

Reed does not have direct evidence of retaliation.[9] Therefore, the court will employ the burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005) (applying the burden-shifting framework in retaliation case); *see also Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) ("An employee can prove retaliation through circumstantial evidence, using the *McDonnell Douglas* burden-shifting analysis." (citations omitted)).

Title VII's retaliation provision "contains an 'opposition clause' which prohibits retaliation against an employee . . . because she 'opposed any practice made an unlawful employment practice by this subchapter.'" *Brower v. Runyon*, 178 F.3d 1002, 1005 n.3 (8th Cir. 1999) (quoting 42 U.S.C. § 2000e-3(a)). "The ultimate question in any retaliation case is whether the employer's adverse action against the employee was motivated by retaliatory intent." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006).

> To succeed under this analytical framework, the plaintiff must first present evidence sufficient to establish a prima facie case. *Hesse v. Avis Rent A Car Sys., Inc.,* 394 F.3d 624, 632 (8th Cir. 2005). There are three elements to a prima facie

---

[7] The court will refer to the first four allegations of retaliation as Reed's "Employment-Related Retaliation" claims.

[8] The court will refer to the fifth allegation of retaliation as Reed's "Retaliatory Litigation" claims.

[9] Reed does not explicitly concede that she does not have direct evidence of retaliation. However, in her Resistance to summary judgment of Count II, Reed immediately begins discussing the "prima facie case" and never discusses direct evidence. *See* Resistance (docket no. 69-1, at 20).

> retaliation case. The plaintiff must demonstrate that he or she took part in protected conduct, that he or she was subjected to an adverse employment action, and that there exists a causal nexus between the protected conduct and the adverse action. *Id.* The plaintiff's burden at the prima facie case stage of the analysis is not onerous, and "[a] minimal evidentiary showing will satisfy this burden of production." *Rodgers v. U.S. Bank, N.A.,* 417 F.3d 845, 850 (8th Cir. 2005) (quoting *Pope v. ESA Serv., Inc.,* 406 F.3d 1001, 1007 (8th Cir. 2005)).

*Id.* "Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions, and then shifts back to the plaintiff to show that the defendant's reason was pretextual." *Turner v. Gonzales,* 421 F.3d 688, 696 (8th Cir. 2005) (citing *Hesse,* 394 F.3d at 631). "The ultimate burden of proof or persuasion to show that the employer's conduct was motivated by retaliatory intent remains at all times on the plaintiff." *Wallace,* 442 F.3d at 1119 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511 (1993)).

### A. Employment-Related Retaliation Claims

#### 1. The Prima Facie Case

Reed "must demonstrate that [she] took part in protected conduct, that [she] was subjected to an adverse employment action, and that there exists a causal nexus between the protected conduct and the adverse action." *Id.* The court will analyze, in turn, each prong of the prima facie case.

##### a. Protected conduct

Defendants concede and the court finds, as a matter of law, that Reed established the first element of a prima facie case. Reed's complaints on February 6, 2004, to Chief Deputy Fitch and Sheriff Hannes constituted protected conduct, as did her formal complaint to the ICRC on July 27, 2004. *See Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 849 & 851 (8th Cir. 2005) (determining that plaintiff in sexual harassment retaliation case established that she had "engaged in statutorily protected conduct" because she had reported

31

to defendant's equal employment opportunity officer that one of defendant's employees was exposing himself to women); *see also Kasper*, 425 F.3d at 502 & 503 n.3 (rejecting plaintiff's contention that there was a material issue of fact in dispute and concluding that plaintiff first engaged in protected activity when she reported her manager's inappropriate conduct to the defendant's management-level employees).

### b.    Adverse employment action

The court finds that Reed presented evidence from which a jury could find that she suffered an adverse employment action.  The court finds that Reed established the second element of a prima facie case.

In *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006), the Supreme Court recently announced a new standard for the adverse employment action requirement in the context of a Title VII retaliation claim.  The newly announced standard differs from the one previously used by the Eighth Circuit Court of Appeals.  *See id.* at 2410 (citing and abrogating *Manning v. Metro. Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir. 1997)).  The Supreme Court ruled that "the anti-retaliation provision [of Title VII], unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."  *Id.* at 2412-13 (citation omitted).  *But see Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000) (en banc) (holding that an unfavorable performance evaluation that does not lead to a change in compensation, responsibilities or benefits does not constitute an adverse employment action under Title VII).  In *White*, the Supreme Court determined that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means [the challenged action] well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *White*, 126 S. Ct. at 2415 (quotations omitted).  The Supreme Court explained that it "speak[s] of *material* adversity because [the Supreme Court] believe[s] it is important to separate significant from trivial harms."  *Id.* (emphasis

Case 1:05-cv-00064-LRR   Document 96   Filed 02/08/07   Page 32 of 44

in original). The Supreme Court further explained that it "refer[s] to reactions of a *reasonable* employee because [the Supreme Court] believe[s] that the provision's standard for judging harm must be objective." *Id.* (emphasis in original).

The court finds that, under the standard announced in *White*, Reed has raised a genuine issue of material fact with respect to whether she suffered a "materially adverse" action. Reed filed her formal complaint with the ICRC on July 27, 2004. Within less than two months, on September 14, 2004, she was ordered to work under Deputy Johnson and lost virtually all authority to make administrative decisions regarding the inmates and jail staff. *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (holding that the employer's "conduct, which included reduction of duties, disciplinary action and negative personnel reports, as well as required remedial training, constituted adverse employment action"). Moreover, prior to September 14, 2004, the jail staff went to her when they had concerns or problems. Once Deputy Johnson was named Reed's supervisor, her staff turned to Sheriff Hannes, Chief Deputy Fitch or Deputy Johnson for guidance.

Under the new standard, the assignment of the interim supervisor and corresponding loss of authority and responsibility "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 126 S. Ct. at 2415. The Iowa Supreme Court has not yet determined that the standard announced in *White* is applicable to the ICRA. The court finds that, even if the Iowa Supreme Court were to decline to apply *White*, Defendants' actions "detrimentally alter[ed] the terms or conditions" of Reed's employment. *See Spears*, 210 F.3d at 854. Although Reed has remained employed with full salary and benefits after she filed the complaint with the ICRC, the authority she previously had to conduct business and make administrative decisions at the jail evaporated. Therefore, Reed has established, for summary judgment purposes, that Defendants took a materially adverse employment action against her after she filed her July 27, 2004 ICRC complaint.

### c. *Causal nexus between protected conduct and adverse employment action*

The court also finds that Reed established the third element of a prima facie case. Reed presented sufficient evidence to raise a genuine issue of material fact as to whether her July 27, 2004 complaint about Sheriff Hannes's harassment is causally connected to the assignment of Deputy Johnson and her corresponding loss of authority and discretion. In other words, Reed established a "causal nexus between the protected conduct and the adverse action." *Wallace*, 442 F.3d at 1119.

"To establish a causal link . . . , the employee must prove that an employer's retaliatory motive played a part in the adverse employment action." *Hite*, 446 F.3d at 865 (quotations omitted). "[E]vidence that gives rise to 'an inference of retaliatory motive' on the part of the employer is sufficient to establish a causal link." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (quoting *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir. 1992)).

"It is well-established in [the Eighth Circuit] that mere temporal proximity between an employee's protected activity and the employer's adverse employment treatment generally will not suffice to create a genuine issue of fact on a retaliation claim." *Tatum*, 408 F.3d at 555; *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing cases which hold that three-month and four-month intervals between the protected activity and the adverse employment action is insufficient to establish the causal nexus); *Kipp*, 280 F.3d at 897 (determining that a two-month interval was, by itself, insufficient to establish a causal nexus). The Eighth Circuit Court of Appeals has stated:

> An employee can establish a causal link between her protected activity and the adverse employment action through "the timing of the two events." *Eliserio v. United Steelworkers of Am.*, 398 F.3d 1071, 1079 (8th Cir. 2005). "A pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement."

34

> Smith [*v. Allen Health Sys., Inc.,*], 302 F.3d [827,] 832 [(8th
> Cir. 2002)]. The mere coincidence of timing, however, is
> rarely sufficient to establish the causation element. *Haas v.
> Kelly Serv., Inc.,* 409 F.3d 1030, 1037 (8th Cir. 2005). Cases
> in which we have determined that temporal proximity alone was
> sufficient to create an inference of the causal link "have
> uniformly held that the temporal proximity must be 'very
> close.'" *Wallace v. Sparks Health Sys.,* 415 F.3d 853, 859 (8th
> Cir. 2005).
>
> Even if temporal proximity alone is insufficient to establish
> causation, the employee may attempt to prove causation by
> providing evidence of the employer's discriminatory comments.
> *See Watson v. O'Neill,* 365 F.3d 609, 613 (8th Cir. 2004)
> (finding a causal connection between the employee's protected
> activity and the adverse employment action where one
> supervisor said that he was not "going to let a nigger manage
> my bitches," while another supervisor commented that the
> employee "would never excel in the agency" because he
> assisted in a 1993 employment discrimination case against the
> supervisor). Furthermore, where an ultimate decisionmaker
> relies on the discriminatory comments of another employee or
> supervisor in deciding to terminate the employee, the employee
> may be able to establish a causal connection. *See Fast v. S.
> Union Co., Inc.,* 149 F.3d 885, 891 (8th Cir. 1998).

*Hite*, 446 F.3d at 866. However, "[a] gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive." *Hesse*, 394 F.3d at 633. "[A] longer time gap between the protected activity and the adverse employment action 'weakens the inference of retaliation that arises when a retaliatory act occurs shortly after the complaint.'" *Shanklin v. Fitzgerald*, 397 F.3d 596, 604 (8th Cir. 2005) (quoting *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 989 (8th Cir. 1999)). With a "lengthy delay, any causal nexus inference tends to evaporate." *Id.* The Eighth Circuit Court of Appeals has determined that a gap of ten months and a gap of one year equate to such

35

"lengthy delays." *See Kasper*, 425 F.3d at 502-04 (one year gap); *Shanklin*, 397 F.3d at 604 (ten month gap).

Here, Reed filed her complaint on July 27, 2004. The assignment of Deputy Johnson came on September 14, 2004, exactly seven weeks after she filed the official ICRC complaint. In and of itself, this time interval cannot justify a causal link as a matter of law. *See also McBurney v. Stew Hanson's Dodge City, Inc.*, 398 F.3d 998, 1003 (8th Cir. 2005) ("We have held that a two-month interval between protected activity and termination diluted any inference of causation such that the temporal connection could not justify a causal link as a matter of law." (citing *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002))); *cf. Wallace*, 442 F.3d at 1119-20 (stating that "the timing in this instance strongly supports an inference of causation for the purpose of the prima facie case" where only fifteen days passed between the time plaintiff reported harassment and the time her employer made the decision to terminate her). Reed has not shown a causal connection based on temporal proximity alone, because "any causal nexus inference evaporated" in the seven weeks between her official complaint and the assignment of her new supervisor. *See Shanklin*, 397 F.3d at 604.

The question, then, is whether Reed has shown a causal nexus based upon discriminatory comments or actions. *Hite*, 446 F.3d at 866 (citing *Watson*, 365 F.3d at 613); *see McBurney*, 398 F.3d at 1003 (holding that "[n]either time nor discriminatory actions link[ed]" the plaintiff's transfer to his taking leave under the Family Medical Leave Act and affirming grant of summary judgment because the plaintiff failed to establish "a sufficient causal link" in making his prima facie case of retaliation); *Watson*, 365 F.3d at 613 (finding a causal connection, in part, because of a supervisor's derogatory racial comments).

The court finds that Reed has established a causal connection. The following facts support an inference that Reed's supervisor and authority changed because she complained

36

about sexual harassment: (1) After Reed made her complaint to the ICRC, Sheriff Hannes lost all "faith, trust, [and] confidence" in Reed. He plans to terminate her employment at the conclusion of the instant litigation. (2) Although Defendants promised to have DCI or another law enforcement entity conduct an investigation into Reed's allegation that someone searched her desk during the night shift on October 20 to 21, 2004, no law enforcement agency ever commenced an investigation. (3) After the parties' had reached the Stipulation, Deputy Johnson told Reed: "I'm supposed to tell you never to come back around here or in this building, and I guess there would be no reason for you to." Thus, Reed established a causal connection between the adverse employment action and her complaint of harassment. She has satisfied the third element of her prima facie case.

### d. Conclusion

In sum, Reed has met her burden of making a "minimal evidentiary showing" to "satisfy [her] burden of production" on the prima facie case. *Rodgers,* 417 F.3d at 850.

### 2. The Legitimate, Nondiscriminatory Reasons

Since Reed established a prima facie showing of retaliation, a presumption of retaliation arises and the burden shifts to Defendants to show a legitimate, nondiscriminatory reason for the adverse employment action. *Wallace,* 442 F.3d at 1119-20. Here, Defendants do not provide a legitimate, nondiscriminatory reason for the decision to make Reed seek authorization from Deputy Johnson when making administrative decisions. Defendants only discuss legitimate, nondiscriminatory reasons for the other actions taken, namely, Sheriff Hannes's attendance at the jail staff meetings, the investigation into Reed's department, the office search, and the initiation of a lawsuit against Reed. Although the reassignment of a supervisor other than Sheriff Hannes has an obvious legitimate, nondiscriminatory reason (to separate the alleged harasser from the alleged victim), none of the summary judgment documents filed by Defendants discuss any legitimate, nondiscriminatory reason for taking away Reed's ability to make administrative

37

decisions at the jail. Therefore, Reed's Employment-Related Retaliation Claims must be submitted to a jury.

### B. Retaliatory Litigation Claims

Defendants seek summary judgment on Reed's claim for Retaliatory Litigation. Defendants' concern stems from the following events: On April 19, 2005, Cedar County and Sheriff Hannes, in his official capacity, filed a counterclaim seeking declaratory judgment permitting them to discharge Reed. On November 7, 2005, the court dismissed the counterclaim without prejudice. On December 7, 2005, Defendants filed the same claim for declaratory judgment in state court, and on December 23, 2005, Reed filed a motion to dismiss. The state court granted the motion to dismiss. That state court ruling is currently on appeal to the Iowa Supreme Court.

Reed's Complaint contains an allegation of retaliation in violation of Title VII and the ICRA. The first twenty-five paragraphs of the Complaint, which set forth the facts underlying the retaliation claims, make no mention of retaliatory litigation. When Reed filed her Complaint on April 5, 2005, she had no grounds to make such an allegation, because Defendants had not yet filed their counterclaim or state court action. Further, Reed did nothing to amend her Complaint after Cedar County and Sheriff Hannes allegedly retaliated by filing a counterclaim on April 19, 2005, and a state action on December 7, 2005.

It was not until June 23, 2006, that Reed first filed a document indicating she was pursuing a claim of Retaliatory Litigation. On June 23, 2006, Reed filed her Second Administrative Complaint and alleged the following:

> I have been subject to a continuing pattern of retaliation and discrimination including two unsuccessful attempts to have the court rule I am a bad employee, and an appeal of the unsuccessful lawsuit. The allegations are false, scandalous and defamatory.

Reed has never amended her Complaint to include such allegations. The period for amending the Complaint pursuant to Federal Rule of Civil Procedure 15 expired over one year ago, on January 16, 2006, *see* Order (docket no. 10, at ¶ 2). Moreover, the trial is scheduled to commence in less than one month. Therefore, the court will not entertain a motion to amend the Complaint at this late stage.

Because there is no claim for retaliatory litigation in the Complaint, Reed cannot prevail on such a claim. Defendants' Motion and Sheriff Hannes's Motion shall be granted.

### C. Conclusion

Reed's claims for retaliation survive summary judgment insofar as she is alleging that she was retaliated against in the workplace. Because Reed failed to amend her Complaint to include allegations regarding a claim of retaliatory litigation, Defendants' Motion and Sheriff Hannes's Motion shall be granted in that regard.

## VIII. THE INDIVIDUAL CAPACITY CLAIMS

The court shall now address the arguments that Sheriff Hannes raises in Sheriff Hannes's Motion which pertains only to the claims against him in his individual capacity. Sheriff Hannes claims that he is entitled to summary judgment on the Title VII claim in Count I because he cannot be liable in his individual capacity under Title VII. Sheriff Hannes claims that Reed cannot recover punitive damages from him under the ICRA, so he is entitled to "summary judgment on the issue of punitive damages." Finally, he claims that the ICRA claims are barred by the statute of limitations.

### A. Reed's Title VII Claims

It is well-settled that "supervisors may not be held individually liable under Title VII." *Bonomolo-Hagen v. Clay Cen.-Everly Cmty. Sch. Dist.*, 121 F.3d 446, 447 (8th Cir. 1997) (per curiam); *see also Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1111 (8th Cir. 1998) (citing *Bonomolo-Hagen* with approval). Therefore, as a matter of law, Sheriff

Case 1:05-cv-00064-LRR   Document 96   Filed 02/08/07   Page 39 of 44

Hannes cannot be liable in his individual capacity under Title VII. As to the Title VII claim against Sheriff Hannes in his individual capacity, Count I shall be dismissed.

Sheriff Hannes's Motion does not seek summary judgment on Count II, despite the fact that Count II alleges retaliation in violation of Title VII. Although Sheriff Hannes's Motion is not a model of clarity, the court, in the interest of judicial economy, shall also grant summary judgment on Count II insofar as it alleges a Title VII retaliation claim against Sheriff Hannes, in his individual capacity.

In sum, the Title VII claims in Counts I and II shall be dismissed as to Sheriff Hannes, in his individual capacity.

### B. Statute of Limitations

Sheriff Hannes, in his individual capacity, claims that Reed's ICRA claims are time-barred. He argues that, because Reed did not file her ICRC complaint until July 27, 2004, any acts of harassment which occurred prior to January 29, 2004, are time-barred.

"A sex discrimination complainant may recover for any discriminatory act for which the statute of limitations has not expired." *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 572 (8th Cir. 1997) (citations omitted). The ICRA provides, in relevant part: "A claim under this chapter shall not be maintained unless a complaint is filed with the commission within one hundred eighty days after the alleged discriminatory or unfair practice occurred." Iowa Code § 216.15(12). Reed filed her complaint on July 27, 2004, therefore, "she can recover for acts reaching back" to January 29, 2004, under the ICRA. *Kimzey*, 107 F.3d at 572. Evidence of incidents occurring before this date can, however, be admissible if they are part of a continuing violation. *Id.*

The Iowa Supreme Court "recognized and applied the 'continuing violation' doctrine to resolve statute of limitations claims in discrimination actions." *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 741 (Iowa 2003) (quoting *Hy-Vee*

40

*Food Stores, Inc. v. Iowa Civil Rights Comm'n*, 453 N.W.2d 512, 527 (Iowa 1990)). The Iowa Supreme Court explained the continuing violation doctrine:

> Generally, if a violation is continuing, the period of limitation does not begin to run on a claim at the time the unlawful act first occurs, but the claim is considered to be filed within the period of limitation if some unlawful acts occurred within the limitations period. [*Hy-Vee*, 453 N.W.2d at 527]. However, this doctrine applies differently to claims of discrete discriminatory acts than to claims of hostile work environment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-21 (2002).

*Farmland Foods*, 672 N.W.2d at 741. When a plaintiff claims hostile work environment, "as long as 'an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'" *Id.* (quoting *Morgan*, 536 U.S. at 117); *see also Kimzey*, 107 F.3d at 573 (discussing Title VII and explaining that "evidence concerning all circumstances of the complainant's employment must be considered, including the frequency of the offending conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasaonbly interfered with work performance").

The last acts which "contributed to" Reed's hostile work environment claim occurred in February of 2004. On July 27, 2004, Reed filed her ICRC complaint. The continuing violation doctrine is applicable and the last of the "violations" occurred within the 180-day period, that is, in February of 2004. Reed's claim is based on the "cumulative effect of individual acts" and "an act contributing to the claim occur[ed] within the filing period . . . ." *Morgan*, 536 U.S. at 115 & 117. Reed presented facts showing that Sheriff Hannes made sexually harassing statements and gestures during the 180-day statutory period that were "part of the same actionable hostile work environment practice" as the acts that occurred prior to January 29, 2004. *Id.* at 120. Resolving all factual disputes in Reed's favor, the court finds that the acts committed by Sheriff Hannes during the 180-day

41

limitations period and those outside of it are all part of the same actionable hostile work environment practice. Her ICRA hostile work environment claim in Count I is not time-barred. Summary judgment shall be denied as to this claim against Sheriff Hannes in his individual capacity.

Sheriff Hannes argues that, because there were large time breaks in the alleged harassment, there were breaks in the hostile environment and, thus, Reed's claims are time-barred. To the contrary, the Eighth Circuit Court of Appeals has found that "a seven-month hiatus in harassing acts" is not enough to cause a break in the hostile environment. *Rowe v. Hussmann Corp.*, 381 F.3d 775, 780 (8th Cir. 2004); *see id.* (assessing timeliness of plaintiff's claims under Title VII and the Missouri Human Rights Act and concluding as a matter of law "that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the [same] hostile work environment"). Reed has presented evidence showing that Sheriff Hannes engaged in sexually harassing behavior throughout 2000, 2001, 2002, 2003 and in January and February of 2004. Reed's hostile work environment sexual harassment claims survive summary judgment.

### C. *Punitive Damages*

Sheriff Hannes, in his individual capacity, claims that he is entitled to summary judgment on the issue of punitive damages.[10] Sheriff Hannes analyzes ICRA law only, because he asserts that he cannot be held liable under Title VII and no punitive damages can be assessed against him under 42 U.S.C. § 1981a.

---

[10] Sheriff Hannes's Motion seeks summary judgment on Reed's assertion that punitive damages are available under the ICRA. Although Federal Rule of Civil Procedure 56 permits a party to move for summary judgment on "a claim, counterclaim, or cross-claim . . . [,]" it does not provide that parties may move for summary judgment on the issue of damages. Fed. R. Civ. P. 56(a). Nonetheless, the court deems it appropriate to address this portion of Sheriff Hannes's Motion.

Punitive damages are not available under the ICRA. *See Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 384-85 (Iowa 1986) ("[The ICRA] does not give the [Iowa Civil Rights] Commission the express authority to award punitive damages."); *see also Channon v. United Parcel Service, Inc.*, 629 N.W.2d 835, 851 (Iowa 2001) (noting that "the ICRA does not permit punitive damages").

Accordingly, Sheriff Hannes's Motion shall be granted as to Reed's claims for punitive damages under the ICRA.[11]

### IX. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED**:

(1)    Cedar County and Sheriff Hannes's Motion for Summary Judgment (docket no. 53) is **GRANTED IN PART** and **DENIED IN PART**;

(2)    The Motion for Summary Judgment of Defendant Daniel Hannes (docket no. 55) is **GRANTED IN PART** and **DENIED IN PART**;

(3)    The following claims shall proceed to trial:

1.    Hostile Work Environment Claim in Count I under Title VII and the ICRA against Cedar County and Sheriff Hannes, in his official capacity.

2.    Hostile Work Environment Claim in Count I under the ICRA against Sheriff Hannes, in his individual capacity.

---

[11]    Cedar County and Sheriff Hannes, in his official capacity, do not seek summary judgment on the punitive damages claims under the ICRA. However, the court notes that, to the extent Reed seeks punitive damages against Cedar County and Sheriff Hannes, in his official capacity, such damages are not available under the ICRA. *See Channon*, 629 N.W.2d at 851.

3.     Employment-Related Retaliation Claim in Count II under Title VII and the ICRA against Cedar County and Sheriff Hannes, in his official capacity.

4.     Employment-Related Retaliation Claim in Count II under the ICRA against Sheriff Hannes, in his individual capacity.

5.     Battery Claim in Count III against Sheriff Hannes, in his individual capacity.

**IT IS SO ORDERED.**

DATED this 8th day of February, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

Case 1:05-cv-00064-LRR   Document 96   Filed 02/08/07   Page 44 of 44